# In the United States Court of Federal Claims

| | |
|---|---|
| ORVILLE BLEVINS, JR., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | No. 18-cv-4372 <br><br> Filed: February 18, 2022 |
| ROBERT W. and MARGARET E. ALEXANDER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | No. 18-cv-4371 <br><br> Filed: February 18, 2022 |

*Lindsay S.C. Brinton*, Lewis Rice LLC, St. Louis, Missouri argued for the *Blevins* Plaintiffs. With her on the briefs is *Meghan S. Largent*, Lewis Rice LLC, St. Louis, Missouri.

*Ashley M. Carter* and *David Allen Harrington*, United States Department of Justice, Environmental & Natural Resources Division, Washington, District of Columbia argued for Defendant in the *Blevins* case. With Ms. Carter on the briefs is *Jean E. Williams,* Acting Assistant Attorney General, Environmental & Natural Resources Division, Washington, District of Columbia.

*Mark F. (Thor) Hearne, II*, True North Law, LLC, St. Louis, Missouri argued for the *Alexander* Plaintiffs. With him on the briefs are *Stephen S. Davis*, True North Law, LLC, St. Louis, Missouri; *James H. Hulme* and *Morgan Pankow*, Arent Fox, LLP, Washington, District of Columbia.

*Ashley M. Carter* and *David Allen Harrington*, United States Department of Justice, Environmental & Natural Resources Division, Washington, District of Columbia argued for Defendant in the *Alexander* case. With them on the briefs are *Scott A. Crawford,* United States Department of Justice, Environmental & Natural Resources Division, *Jean E. Williams,* Acting Assistant Attorney General, Environmental & Natural Resources Division, Washington, District of Columbia, and *Todd Kim*, Assistant Attorney General, Environmental & Natural Resources Division, Washington, District of Columbia.

## MEMORANDUM AND ORDER

The Monon Route, also known as the Hoosier Line, connected one end of Indiana to the other by railway and served as an important economic and cultural link for the state.  As George Ade — the Aesop of Indiana — explained in 1930:

> The Monon pathway is by open prairies and deep woodland, across the Kankakee and Tippecanoe and Wabash, up to the gates of important cities, and through the quiet shades of college towns.  It links the Ohio with the Grand Calumet and lays a friendly hand on factories, fields, and quarries through an important chain of counties.[1]

Friendly though that hand may be, it left legal imprints upon privately-owned parcels — easements.  If the railroad ever removes its gentle hand from a portion of the route, the railroad's easement extinguishes, and the underlying land interests return to whomever holds a reversionary interest in the easements.  CSX Transportation started that process for a 62.3-mile stretch of the Hoosier Line (the "disputed corridor") in 2018.  Negotiations to convert the disputed corridor into a recreational trail under the National Trails System Act interrupted that process.  Several landowners whose parcels abut the disputed corridor filed suit seeking compensation for the interruption of their reversionary interests.

These landowners present their claims to the Court in two separate cases arising under the Fifth Amendment of the United States Constitution.  The plaintiffs in *Alexander v. United States*, Case No. 1:18-cv-4371 (*Alexander* Plaintiffs) and *Blevins v. United States*, Case No. 1:18-cv-4372 (*Blevins* Plaintiffs), collectively the Plaintiffs, originally filed a single suit.  Plaintiffs' Complaint

---

[1] George Ade, *Monon Route*, INDIANA HISTORICAL SOCIETY, M0376_BOX1_FOLDER18, https://images.indianahistory.org/digital/collection/V0002/id/1844/rec/1 (last visited Feb. 18, 2022).  George Ade was one of Indiana's leading writers in the early 20th century.  His humorist works earned him the nickname the "Aesop of Indiana."  *Author's Northern Indiana Home Prepares for Next Chapter*, INDIANA LANDMARKS (Jan. 23, 2019), https://www.indianalandmarks.org/2019/01/authors-northern-indiana-home-prepares-for-next-chapter/ (last visited Feb. 18, 2022).

(Case No. 1:18-cv-0437, ECF No. 1) (Pls.' Compl.).  Plaintiffs requested, and the Court granted, severance into two subcases because one set of Plaintiffs lagged the other in stipulating title with Defendant the United States (Defendant).  *See* Plaintiffs' Unopposed Motion to Partition Plaintiffs into Sub-Cases (Case No. 1:18-cv-0437, ECF No. 70); Order Granting Motion Pursuant to Rule 21 (Case No. 1:18-cv-00437, ECF No. 71.)  Plaintiffs' cases now meet at the same juncture.  As the two cases lead this Court to a single legal conclusion based on the same facts, the Court finds it appropriate to address the arguments made in both cases together in a single opinion.[2]

For the reasons explained below, the *Alexander* Plaintiffs' Motion for Partial Summary Judgment (*Alexander* ECF No. 62) and the *Blevins* Plaintiffs' Motion for Partial Summary Judgment (*Blevins* ECF No. 27) are **GRANTED**.

---

[2] The Court asked the parties whether it should consider the cases "in one opinion, or separate opinions" as both cases are at the summary judgment stage, involve the same legal issues, and concern the same rail line.  Transcript of Oral Argument dated November 18, 2021 (ECF No. 74) (*Alexander* Tr. Oral Arg.) at 57:22-25.  Counsel for the *Alexander* Plaintiffs approved of disposing with the issues in both cases in a single opinion.  *Id.* at 65:22-66:1. Defendant does not object to this approach.  *Id.* at 66:20-24.  Counsel for the *Blevins* Plaintiffs listened to oral argument telephonically and did not voice any objections.  *See id.* at 5:14-17 ("I understand we have some folks on the line, too, who couldn't be here today, and so we're pleased to have them on, as well as the Blevins attorneys, I believe, the Blevins plaintiff counsel.").  The *Blevins* Plaintiffs also did not file any objections after learning at oral argument about the Court's intention to address both cases in a single opinion.

BACKGROUND

**I.   Railroad Regulation and the Trails Act**

Railroads and their "construction, acquisition, operation, abandonment, or discontinuance" fall under the exclusive jurisdiction of the Surface Transportation Board (STB or Board).[3]  49 U.S.C. § 10501(b).  Its exclusive authority over railroads preempts any "remedies provided under Federal or State law."  *Id.*  While passenger railroad infrastructure peaked in the United States in the early 20th century,[4] the nation's freight railways remain "universally recognized in the industry as the best in the world."  *American Railways High-Speed Railroading*, THE ECONOMIST (July 22, 2010),  https://www.economist.com/briefing/2010/07/22/high-speed-railroading  (last   accessed Feb. 18, 2022).  The United States retained this reputation even though the nation experienced a sharp reduction in rail trackage during the last century.  *Preseault v. Interstate Com. Comm'n* (*Preseault I*), 494 U.S. 1, 5 (1990).  Congress, however, recognized that continued track reduction threatens that reputation.  *Id.* at 918.  As track reduction would be nearly irreversible given the enormous costs of reassembling the easements needed for a nationwide rail system, Congress enacted several statutes to preserve railroad rights-of-way.  *Id.* at 918-19.

---

[3] Congress   initially   conferred   exclusive   and   plenary   authority   on   the   Interstate   Commerce Commission (ICC) to regulate most railroad lines in the United States in the Transportation Act of 1920. Pub. L. No. 66-152, § 402, 41 Stat. 476-78.  In 1995, Congress enacted the ICC Termination Act, Pub. L. No. 104-88, 109 Stat. 803 (codified in scattered sections of the U.S.C., including 49 U.S.C. §§ 10101-16106), abolishing the ICC and establishing the STB.  *Pejepscot Indus. Park, Inc. v. Maine. Cent. R. Co.*, 215 F.3d 195, 197 (1st Cir. 2000).

[4] "The idea of a transcontinental railroad predated the California gold rush.  From the time that Asa Whitney had proposed a relatively practical plan for its construction in 1844, it had, in the words of one of this century's leading historians of the era, 'engaged the eager attention of promoters and politicians until dozens of schemes were in the air.'"  *Leo Sheep Co. v. United States*, 440 U.S. 668, 670-71 (1979).

After early legislative efforts failed to establish a functioning process for preserving dormant railroad rights-of-way, Congress passed the National Trails System Act Amendments of 1983 (Trails Act).[5]  *Id.* at 6; 16 U.S.C. §§ 1241-1251.  The Trails Act preserves "established railroad rights-of-way for future reactivation of rail service" by authorizing recreational use of the rights-of-way on an interim basis.  16 U.S.C. § 1247(d).  Section 1247(d) states in relevant part:

> Consistent with the purposes of [previous legislation], and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.

16 U.S.C. § 1247(d).  This process is known as "rail banking."  *Memmer v. United States*, 150 Fed. Cl. 706, 713 (2020).

To initiate the rail banking process, a rail carrier proposing to abandon a line must either (1) file an application to abandon pursuant to 49 U.S.C. § 10903, or (2) file a notice of exemption to abandon the line pursuant to 49 U.S.C. § 10502.  *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004).  A railroad may only pursue the latter route if it certifies that:

> no local traffic has moved over the line for at least 2 years and any overhead traffic on the line can be rerouted over other lines and that no formal complaint filed by a user of rail service on the line (or a state or local government entity acting on behalf of such user) regarding cessation of service over the line either is pending with the Board or any U.S. District Court or has been decided in favor of the complainant within the 2-year period.

---

[5] These amendments modified the National Trails System Act.  *See* Pub. L. 90-543, § 2(b), 82 Stat. 919 (1968) (prior to 1983 amendments).

49 C.F.R. § 1152.50(a)-(b).[6]  A railroad may only consummate abandonment "if the Board finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C. § 10903(d)(2).

The next step in the rail banking process provides interested third parties an opportunity to file protests and comments with the Board regarding the abandonment or discontinuance proceeding.  49 C.F.R. §§ 1152.25, 1152.28(a), 1152.29(a).  Interested third parties may, for example, submit a request for interim use of the railroad line as a recreational trail pursuant to 16 U.S.C. § 1247(d), seek a public use condition pursuant to 49 U.S.C. § 10905, or make an offer of financial assistance (OFA) pursuant to 49 U.S.C. § 10904.  49 C.F.R. §§ 1152.25(a)(1)-(2), 1152.28(a)(1)-(2); see also Memmer, 150 Fed. Cl. at 714.

If a third party proposes converting the railroad to a recreational trail and offers to assume responsibility for the right-of-way's management and legal liability, the STB issues (i) a Certificate of Interim Trail Use (CITU) if the railroad filed an application to abandon, or (ii) a Notice of Interim Trail Use or Abandonment (NITU) if the railroad filed a notice of exemption.  See 49 C.F.R. § 1152.29.  This case involves a NITU.  A NITU "permit[s] the railroad to discontinue service, cancel any applicable tariffs, and salvage track and material, consistent with interim trail use and rail banking." Id. § 1152.29(d)(1).  It further "permit[s] the railroad to fully abandon the line if no interim trail use agreement is reached within one year from the date on which the NITU is issued, subject to appropriate conditions." Id. at § 1152.29(d)(1)(i)  This deadline may be extended for an additional three years. See 49 C.F.R. § 1152.29(d)(1)(ii).[7]

---

[6] An April 9, 2018 amendment to 49 C.F.R. § 1152.50 replaced a reference to "Military Traffic Management Command" with "Military Surface Deployment and Distribution Command." See Abandonment and Discontinuance of Rail Lines and Rail Transportation Under 49 U.S.C. § 10903, 83 Fed. Reg. 15079 (Apr. 9, 2018).  That minor amendment does not affect the present action.

[7] Originally, the statute provided for abandonment 180 days after the NITU's issuance and did not

The next step in the rail banking process depends on whether the railroad owner and the third party reach an agreement on converting the line into a recreational trail. If the parties reach an agreement, then the railroad right-of-way transforms into a recreational right-of way. *See* 16 U.S.C. § 1247(d). The trail use agreement operates on an interim basis and prevents corridors from being deemed abandoned under state law throughout its duration. *See Preseault I*, 494 U.S. at 8; *Preseault v. United States* (*Preseault II*), 100 F.3d 1525, 1552 (Fed. Cir. 1996). This preserves the right-of-way for potential rail use in the future. *Preseault I*, 494 U.S. at 8. However, if the railroad does not execute a trail-use agreement, it may fully abandon the line by filing a notice of consummation. 49 C.F.R. § 1152.29(e)(2). The filed notice of consummation divests the Board of jurisdiction over the abandoned railroad line, and "state law reversionary property interests, if any, take effect." *Caldwell v. United States*, 391 F.3d at 1228-29 (citing *Preseault I*, 494, U.S. at 6-8); *see also* 49 U.S.C. § 10904(g). If the railroad does not timely file notice of consummation, its authority to abandon the line "will automatically expire." 49 C.F.R. § 1152.29(e)(2).

## II.   The Disputed Corridor

The pending dispute focuses on a 62.3-mile railroad segment on the Northern Region, Louisville Division, Hoosier Subdivision, between milepost 00Q 251.7, near Bedford, Indiana, and milepost 00Q 314.0, near New Albany, Indiana (the disputed corridor). *See* CSXT's Petition for Exemption, Docket No. AB-55 (Sub-No. 698X) (*Blevins* ECF No. 31-1) (Pet. for Exemption)

---

limit the number of extensions to this deadline. *See* 49 C.F.R. § 1152.29 (2018). That changed on February 2, 2020. Abandonment and Discontinuance of Rail Lines and Rail Transportation Under 49 U.S.C. § 10903, 84 Fed. Reg. 66325-6 (Dec. 4, 2019). Now, the initial negotiation period can be extended for three additional one-year periods, with one narrow exception. 49 C.F.R. § 1152.29(d)(1)(ii). "Additional one-year extensions, beyond three extensions of the initial period, are not favored but may be granted if the trail sponsor and railroad agree and extraordinary circumstances are shown." 49 C.F.R. § 1152.29(d)(1)(ii).

at 4; *see also* CSXT's Notice of Consummation of Service (*Alexander* ECF No. 62-2) at 2.[8]  CSX

Transportation, Inc (CSXT or the Railroad) currently owns the disputed corridor.  *See* Combined

Environmental and Historic Report, STB Docket No. AB-55 (Sub. No. 775X) (CEHR) (*Blevins*

ECF No. 27-3) at 13-14, (*Alexander* ECF No. 62-1) at 13-14.  The parties agree that Plaintiffs each

own land adjacent to the 62.3-mile rail line easement.  *Blevins* Parties' Joint Title Stipulations and

Status Report (ECF No. 17) (*Blevins* Stipulation) at 1; *Alexander* Parties' Joint Title Stipulations

(ECF No. 39) (*Alexander* Stipulation) at 1.  The parties also agree that the Plaintiffs owned their

respective property on February 28, 2018, the date the STB issued the NITU for the disputed

corridor, and that CSXT holds an easement solely for railroad purposes over the Plaintiffs' land.

*Blevins* Stipulation at 1; *Alexander* Stipulation at 1.

On December 18, 2009, CSXT petitioned the STB to discontinue service over the disputed

corridor to "avoid the costs for operating and maintaining the Line."  CSXT Petition for

Discontinuance of Service Exemption, Docket No. AB-55 (Sub-No. 698X) (Dec. 18, 2009)

(*Blevins* ECF No. 31-1) at 4.  In April 2010, the STB granted CSXT's petition, and CSXT

---

[8] Citations throughout this Memorandum and Order refer to the ECF-assigned page numbers, which do not always correspond to the pagination within the document.  Where both *Alexander* and *Blevins* introduced an exhibit, the Court includes ECF citations to both cases.  The *Alexander* briefing incorporated by reference several exhibits from the *Blevins* briefing.  *See Alexander* Def.'s Resp. at 12 (adopting the essential facts filed by Defendant in *Blevins*); *Blevins* Def.'s Resp. at 13-17 (citing exhibits 1-10 of *Blevins* Plaintiffs' Motion and exhibits 1-5 of *Blevins* Defendant's Response).  Some exhibits were only attached to briefing in one case or the other.  The Court finds it appropriate to take judicial notice of those exhibits because the two cases involve the same railroad corridor and NITU.  *See Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 369 n.7 (2005) (noting "that courts may use judicial notice to support a disposition of summary judgment"); *Phonometrics, Inc. v. Hosp. Int'l, Inc.*, 120 F. App'x 341, 345 (Fed. Cir. 2005) (finding no error in a district court's decision to take notice of plaintiff's CEO's and counsel's statements in a related case because that evidence reflected that plaintiff had no evidence of patent infringement and because the court "did not conclude that non-infringement was indisputable from the statements"); *see also St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("Judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it.").

consummated discontinuance of service on May 12, 2010. *See* STB Decision, Docket No. AB-55 (Sub-No. 698X) (*Blevins* ECF No. 27-1) (STB Decision) at 2; CSXT Letter Confirming Discontinuance of Service (*Blevins* ECF No. 27-2). In granting CSXT's petition, the STB "stress[ed] that CSXT ha[d] not sought abandonment authority . . . [and that] CSXT ha[d] expressed the hope that sufficient traffic can be developed in the future to warrant a resumption of rail service." STB Decision at 5.

CSXT's hope eventually reached the end of the line. On December 18, 2017, in anticipation of filing a notice of exemption seeking to abandon the disputed corridor, CSXT filed a "Combined Environmental and Historic Report," (CEHR) which noted that since CSXT had consummated discontinuance of the line in 2010, the line had been used only to store railroad cars. *See* CEHR (*Blevins* ECF No. 27-3) at 3, (*Alexander* ECF No. 62-1) at 3. It also noted that CSXT intended to consummate abandonment of the line: "[n]o new rail oriented business is expected to develop and the Line is no longer required for operating purposes." *Id*. CSXT again emphasized the dormancy of the disputed corridor when, on the following day, it filed its Verified Notice of Exemption seeking permission from the STB to abandon CSXT's right-of-way: "[n]o local rail traffic has moved over the Line during the past two years," and "[a]ny overhead traffic on the Line can be and has been rerouted." Verified Notice of Exemption (*Alexander* ECF No. 62-3) at 4, (*Blevins* ECF No. 27-4) at 4.

Before CSXT could consummate abandonment, the Indiana Trails Fund (the Fund) asked the STB to issue a Public Use Condition and/or a Notice of Interim Trail Use or Abandonment so that the Fund could develop a recreational trail along the disputed corridor. *See* Public Use Condition and/or a Notice of Interim Trail Use or Abandonment (*Blevins* ECF No. 27-5). Shortly thereafter, CSXT wrote the STB confirming it "agrees to negotiate with Indiana Trails toward a

possible interim trail use/rail banking arrangement for the Line." *See* Agreement to Negotiate Interim Trail Use Rail Banking Agreement (*Blevins* ECF No. 27-6).

On January 8, 2018, the STB published a Notice recognizing CSXT's request to abandon the disputed corridor and stating that the requested exemption would be effective on February 7, 2018, unless the STB received either a petition to stay for environmental issues, an expression of intent to file an OFA, an interim trail use/rail banking request, or a public use condition request. *See* Decision Recognizing CSXT's Petition (*Alexander* ECF No. 62-4) at 2-3; (*Blevins* ECF No. 27-7) at 2-3; 83 Fed. Reg. 936-01. Prior to that deadline, the City of New Albany, Indiana (New Albany) filed a second request that the STB issue a Notice of Interim Trail Use for the disputed corridor. *See* New Albany Request for Interim Trail Use or Abandonment (*Blevins* ECF No. 27-8). CSXT filed a response with the STB, noting that it had previously consented to negotiating trail use with the Fund and that it now intended to negotiate with both the Fund and New Albany. *See* CSXT Letter Consenting to Negotiate (*Blevins* ECF No. 27-9).

In addition to the two rail-banking requests, the STB received two notices of intent to file OFAs which would continue commercial use of the rail line. *See Borough of Columbia v. Surface Transp. Bd.*, 342 F.3d 222, 226 (3d Cir. 2003) (citing 49 U.S.C. § 10904; 49 C.F.R. §1152.27(f)) (explaining that an OFA is "an offer to purchase or subsidize a rail line and so to facilitate continued freight rail service"); Decision and Notice of Interim Trail Use (*Blevins* ECF No. 27-10), (*Alexander* ECF No. 62-8), (*Alexander* ECF No. 64-1) at 2. CSXT responded to the first notice by filing a motion with the STB asking the Board to reject the OFA. *See* CSXT Motion of Jan. 24, 2018, Docket No. AB-55 (Sub. No. 775X) (*Alexander* ECF No. 62-6). CSXT explained to the Board that after more than seven years without any rail service on the disputed corridor, the

individual proposing the first OFA "failed to demonstrate that there is a continued need for rail service on the Line." *Id.* at 6.

CSXT then filed a follow-up letter a few weeks later reiterating that the individual proposing the first OFA "refuses to demonstrate that there is a continued need for rail service, even though the Line has not served shippers since the Board exempted discontinuance in 2010 after holding a public meeting and carefully considering the testimony at that hearing." CSXT Motion of Feb. 8, 2018, Docket No. AB-55 (Sub. No. 775X) (*Alexander* ECF No. 62-7) at 6.   That individual ultimately withdrew his notice of intent to file an OFA after the Board asked him to supplement his notice twice to comply with Board regulations. Decision and Notice of Interim Trail Use (ECF No. 27-10), (*Alexander* ECF No. 62-8), (*Alexander* ECF No. 64-1) at 2 n.1. The STB rejected the second notice of intent to file an OFA as untimely filed. *Id.* at n.2.   Rather than approve an OFA for the disputed corridor, the STB issued a Decision and Notice of Interim Trail Use or Abandonment on February 27, 2018. Decision and Notice of Interim Trail Use (*Alexander* ECF No. 62-8) and (*Blevins* ECF No. 27-10).  The Notice gave CSXT 180 days to negotiate with the Fund and New Albany.  *Id.*  It also placed several conditions on any potential abandonment:

> The abandonment is also subject to the conditions that CSXT shall: (1)(a) retain its interest in and take no steps to alter the historic integrity of all historic properties including sites, buildings, structures, and objects within the project's right-of-way (the Area of Potential Effect) that are eligible for listing or listed in the National Register of Historic Places until the Section 106 process of the National Historic Preservation Act, 54 U.S.C. § 306108, has been completed; (b) report back to the OEA regarding any consultations with the SHPO and the public; (c) not file its consummation notice or initiate any salvage activities related to the abandonment (including the removal of tracks and ties) until the Section 106 process has been completed and the Board has removed this condition; and (2) in the event that any unanticipated archaeological sites, human remains, funerary items, or associated artifacts are discovered during CSXT's salvage activities, immediately cease all work and notify OEA, the Miami Tribe, and the SHPO. OEA shall then consult with the Miami Tribe, SHPO, and other consulting parties, if any, to determine whether appropriate mitigation measures are necessary.

*Id*. at 5.  Three months later, the STB made minor revisions to those conditions, permitting CSXT to conduct requested "salvage activities" except in locations with historic resources.  STB Decision – CSXT Abandonment Exemption, Docket No. AB-55 (Sub No. 775X) (*Blevins* ECF No. 31-3) at 2-3.

The STB has issued multiple extensions of the NITU with CSXT's consent after requests from the Fund and New Albany.  *See e.g.*, Declaration of Gene Payne (*Alexander* ECF No. 51-2) (*Blevins* ECF No. 31-2) (Payne Decl.) ¶¶ 15-16; Request for Extension of Interim Trail Use Negotiation Period, STB Docket No. AB-55 (Sub-No. 775X) (Aug. 17, 2018) (*Blevins* ECF No. 27-11); Request for Extension of Time to Negotiate for Interim Trails Use, STB Docket No. AB-55 (Sub-No. 775X) (Aug. 23, 2018) (*Blevins* ECF No. 27-12); City of New Albany Request for Extension of Interim Trails Use Negotiation Period, STB Docket No. AB-55 (Sub-No. 775X) (February 5, 2021) (*Blevins* ECF No. 31-4); Indiana Trails Fund Request for Extension of Interim Trails Use Negotiation Period, STB Docket No. AB-55 (Sub-No. 775X) (February 16, 2021) (*Blevins* ECF No. 31-5).  The negotiation period was to expire on February 18, 2022.  STB Decision – CSXT Abandonment Exemption, Docket No. AB-55 (Sub No. 775X) (*Blevins* ECF No. 31-3); Request for Extension of Interim Trails Use Negotiation Period (*Blevins* ECF No. 31-4).  However, New Albany and the Indiana Trail Fund requested — and CSXT did not oppose — another one-year extension to the NITU negotiation period.  New Albany Request for Extension of Interim Trials Use Negotiation Period, filed January 21, 2022, Docket No. AB-55 (Sub No. 775X) (*Blevins* ECF No. 49-1); STB Decision, filed February 17, 2022, Docket No. AB-55 (Sub No. 775X) (*Blevins* ECF No. 51-1) (Feb. 17, 2022 STB Decision) at 3 (noting Indiana Trails Fund request).  On February 17, 2022, the STB granted a one-year extension of the NITU negotiating

period until February 18, 2023, without a showing of extraordinary circumstances.[9]  *See* Feb. 17,

2022 STB Decision at 3; *see also infra* at 6 (describing statutory standard for extension.

<u>APPLICABLE LEGAL STANDARD</u>

"Whether a [Fifth Amendment] taking has occurred is a question of law based on factual

underpinnings." *Caquelin v. United States*, 959 F.3d 1360, 1366 (Fed. Cir. 2020).

The Court may grant summary judgment if the pleadings, affidavits, and evidentiary

materials filed in a case reveal that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Rules of the United States Court of Federal

Claims (RCFC or Rule(s)) 56(a).  The moving party bears the initial burden to demonstrate the

absence of any genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  Facts are material if they "might affect the outcome of the suit."  *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A genuine factual dispute exists when "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  A party seeking

to establish a genuine dispute of material fact must "cit[e] to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or

---

[9] This Court questions whether the STB's new decision to grant such exceptions absent "extraordinary circumstances" is lawful given the recently amended Code of Federal Regulations and statements to this Court by counsel at oral argument.  *See* 49 C.F.R. § 1152.29(d)(1)(ii) ("Additional one-year extensions, beyond three extensions of the initial period, are not favored but may be granted if the trail sponsor and railroad agree **and** extraordinary circumstances are shown." (emphasis added); *see also* Transcript of Oral Argument dated July 23, 2021 (ECF No. 42) (*Blevins* Tr. Oral Arg.) at 6:22-24 (responding affirmatively for the Plaintiffs when asked by the Court whether a showing of "extraordinary circumstances" is necessary to extend the NITU beyond February 2022); *Alexander* Tr. Oral Arg. at 43:16-44:16 (acknowledging for Defendant that the new regulation requires a showing of "extraordinary circumstances" to extend the NITU period beyond three one-year extensions; *CSXT*, AB 55 (Sub-No. 775X) (STB served Feb. 17, 2022) at 3 ("New Albany's and Indiana Trails Fund's requests qualify for one additional one-year extension without a showing of extraordinary circumstances.").

declarations, stipulations . . . , admissions, interrogatory answers, or other materials."   Rule 56(c)(1)(A).

While "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962), summary judgment may still be granted when the party opposing the motion submits evidence that "is merely colorable . . . or is not significantly probative."  *Anderson,* 477 U.S. at 251 (internal citation omitted).  The court may only grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita, Elec. Indus. Co., Ltd. v. United States*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

<u>DISCUSSION</u>

The Fifth Amendment of the United States Constitution places an important limit on the government's power to take private property.  *Preseault I*, 494 U.S. at 11.  A bedrock principle of the United States, it mandates that private property shall not "be taken for public use, without just compensation."  U.S. Const. Amend. V.  Courts analyze claims under the Fifth Amendment by determining whether a cognizable property interest exists, and, if one does, "whether the government's action amounted to a compensable taking of that interest." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1348 (Fed. Cir. 2013).  A compensable taking occurs "when government action destroys state-defined property rights."  *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010) (hereinafter *Ladd I*).  Action under the Trails Act causes such destruction when it "convert[s] a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement," *id.*, or compels "the continuation of a railroad-purposes easement to

accommodate negotiations for a trail-use agreement, even if the negotiations are ultimately unsuccessful." *Memmer*, 150 Fed. Cl. at 716 (citing *Ladd I*, 630 F.3d at 1025).

Three threshold issues dictate whether a plaintiff has a cognizable property interest in a Trails Act takings case:

> (1) who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate;
>
> (2) if the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and
>
> (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

*Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009) (citing *Preseault II*, 100 F.3d at 1533).  The parties agree that the threshold criteria are satisfied here because Plaintiffs each own land abutting CSXT's easement for the disputed corridor, and CSXT's easement does not encompass future use as a public recreational trail.   *See Alexander* Parties' Joint Title Stipulations (*Alexander* ECF No. 39); *Blevins* Parties' Joint Title Stipulations and Status Report (*Blevins* ECF No. 17).

The parties disagree, however, on liability.  Plaintiffs argue that liability was established as a matter of law when the NITU issued.  *Blevins* Pls.' Mot. at 21; *see Alexander* Pls.' Mot. at 29 (arguing that a Trails Act taking is a *per se* taking).  Defendant argues that the United States Court of Appeals for the Federal Circuit's (Federal Circuit's) decision in *Caquelin v. United States*, 959 F.3d 1360 (Fed. Cir. 2020), requires the Plaintiffs to establish that the NITU caused a taking based on the facts of this case.  *Alexander* Defendant's Response (*Alexander* Def.'s Resp.) (ECF No. 64) at 13-14; *Blevins* Defendant's Response (*Blevins* Def.'s Resp.) (ECF No. 31) at 20-21.  According to Defendant, Plaintiffs cannot meet their burden because CSXT would not have abandoned the

15

disputed corridor in the absence of the NITU.  *Alexander* Def.'s Resp. at 14; *Blevins* Def.'s Resp.
at 20-21.  While Defendant is correct that this Court must perform a causation analysis, there is no
genuine dispute of material fact that the railroad would have abandoned the disputed corridor
absent issuance of a NITU.[10]   Accordingly, the Plaintiffs meet their burden for partial summary
judgment on the issue of liability.

**I.      Federal Circuit Precedent Requires the Court to Analyze Causation.**

Plaintiffs urge this Court to reject the Federal Circuit's causation analysis requirement; this
Court declines to do so.  In *Caquelin*, the Federal Circuit confirmed that all Fifth Amendment
takings cases require a causation analysis.  959 F.3d 1360, 1371 (Fed. Cir. 2020).  Specifically,
the Federal Circuit affirmed *Ladd I*'s central holding that a government taking occurs when a NITU
is issued, but went on to explain that a fundamental principal applicable to all takings cases is "that
a government action is not a taking of property if, even in the absence of the challenged
government action, the plaintiff would not have possessed the allegedly taken property interest."
*Id.* at 1371 (citations omitted).  Citing the Supreme Court's decision in *Preseault I*, it explained
that the "causation principle focuses on comparing the plaintiff's property interest in the presence

---

[10] The *Blevins* Plaintiffs go further and argue that CSXT has already consummated abandonment
of the disputed corridor under Indiana law. *Blevins* Pls.' Mot. at 15. Under Indiana law, a railroad
right-of-way is abandoned if, among other things, "[t]he Interstate Commerce Commission or the
United States Surface Transportation Board issues a certificate of public convenience and
necessity relieving the railroad of the railroad's common carrier obligation on the right-of-way."
Ind. Code Ann. § 32-23-11-6(a)(2)(A). However, the Surface Transportation Board no longer
issues certificates of public convenience. *See Memmer*, 150 Fed. Cl. at 731-32 (discussing federal
law at the time Indiana Code Section 32-23-11-6 was enacted, and explaining that, because of the
ICC Terminal Act of 1995, the Surface Transportation Board stopped issuing certificates of public
convenience and necessity in 1996). The elimination of certificates of public convenience and
necessity introduces significant uncertainty as to the proper application of Indiana's railroad right-
of-way abandonment statute. The *Blevins* parties submitted supplemental briefing on the subject.
Defendant's Supplemental Brief (ECF No. 47); Plaintiffs' Supplemental Brief (ECF No. 48).
While the Court finds the parties' supplemental briefs helpful, the Court agrees that it is ultimately
unnecessary to resolve this uncertainty in Indiana law.  As discussed below in Section II.a, the
requisite causation analysis does not require reference to state law.

of the challenged government action and the property interest the plaintiff would have had in its absence." *Id.* In the railbanking context, "the NITU would not have altered the continuation of the easement during the NITU period — *i.e.*, would not have caused the only alleged taking of property — if the railroad would not have abandoned the rail line during that period even in the absence of the NITU." *Id.*

The Federal Circuit explained that older cases such as *Ladd I* never held that causation is irrelevant; rather, they merely "use[d] a shorter formulation referring simply to the NITU date as the date of taking." *Id.* at 1372. This shorthand, it explained, "applies where no party has pointed to any legally material difference between the NITU date of issuance (or expiration) and a date of abandonment in the but-for world in which there was no NITU." *Id.* The Federal Circuit subsequently reiterated this holding in *Hardy v. United States*, 965 F.3d 1338, 1349 (Fed. Cir. 2020) (*Hardy I*).[11] This Court is bound by Federal Circuit precedent.

Plaintiffs' objection that the Federal Circuit-mandated causation analysis improperly imports the multi-factor *Penn Central* analysis into Trails Act takings cases lacks merit. *See Alexander* Pls.' Mot. at 37-41. According to Plaintiffs, the Supreme Court's recent statement in *Cedar Point Nursery v. Hassid* that, "[w]henever a regulation results in a physical appropriation of property, a *per se* taking has occurred, and [the] *Penn Central* [regulatory taking analysis] has no place," precludes a fact-intensive causation analysis because Trails Act takings are physical appropriations. 141 S. Ct. 2063, 2072 (2021); *see Alexander* Pls.' Mot. at 27-28. Plaintiff correctly notes that Trails Act takings are physical takings. *Preseault II*, 100 F.3d at 1550-51. However, Plaintiffs ignore that *Caquelin* unequivocally rejected the proposition that its causation analysis

---

[11] This Court references three *Hardy v. United States* decisions that all arise from the same initial case, *Hardy v. United States*, 127 Fed. Cl. 1 (2016). The numbering of *Hardy* cases within this opinion begins with the Federal Circuit's decision as *Hardy I* and continues in subsequent chronological order.

was "a multi-factor approach to the takings question here." 959 F.3d at 1370. *Caquelin* further noted that "as *Ladd I* holds, a NITU like this one does not present a regulatory-takings case." *Id.* at 1368. As *Caquelin* adopted the view that Trails Act takings are *per se* physical takings, it is entirely consistent with *Cedar Point Nursery*.

Indeed, another judge of this court recently dismissed an identical argument. *See Hardy v. United States*, 156 Fed. Cl. 340 (2021) (*Hardy III*). As noted in that case, rather than address *Caquelin*'s causation rule, *Cedar Point* addresses "a unique, narrow question: whether a state access regulation, which allowed union organizers intermittent access to the growers' properties without their consent, constituted a *per se* physical taking." *Id.* at 344-45. This Court agrees.

Indeed, even if the Court were to agree with Plaintiffs that "'causation analysis' makes absolutely no sense in Trails Act takings cases," *Alexander* Pls.' Mot. at 41, this Court cannot set aside clear Federal Circuit precedent calling for a causation analysis. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims"). This Court, therefore, must conduct a causation analysis according to the Federal Circuit's instructions provided in its *Caquelin* and *Hardy I* opinions.

## II. Law Governing the Causation Inquiry.

While the Federal Circuit made it clear that causation is an essential element of Trails Act takings claims, it has not clearly articulated the applicable standards for evaluating causation. *Caquelin* left for another day "whether the plaintiff or the government has the burden of production or persuasion on what the railroad would have done if there had been no NITU." 959 F.3d at 1372. *Caquelin* was also unclear on the extent to which state abandonment law dictates the analysis. *Id.* at 1373. The inconsistent application of state law to the causation analysis in the Court of Federal Claims illustrates such ambiguity. *Compare Loveridge v. United States*, 149 Fed. Cl. 64, 71-72

(2020) (analyzing causation under Oregon abandonment law), *with Memmer*, 150 Fed. Cl.at 748 (performing a non-state specific causation analysis and referencing Indiana abandonment law simply as additional evidence on causation). For the reasons stated below, this Court concludes that Federal Circuit precedent limits the role of state law in a Trails Act causation analysis, and that issuance of a NITU raises a presumption that the railroad owner would have abandoned the right-of-way absent a NITU. Defendant then bears the burden of demonstrating that the railroad owner would not have abandoned the right-of-way in the "but-for world" where a NITU never issued.

      a.    <u>Evaluation of Whether Abandonment Would Have Occurred Absent a NITU</u>
            <u>Does Not Require an Evaluation of State Abandonment Law.</u>

The parties' positions in the present cases highlight the choice-of-law uncertainty following *Caquelin*. The Plaintiffs suggest that a causation analysis should apply Indiana Code section 32-23-11-6(a)(2), which sets forth the requirements for abandonment of a rail line in Indiana after February 27, 1920. *Blevins* Pls.' Mot. at 22; *Alexander* Pls.' Reply at 14 (disagreeing with Defendant's view that "Indiana law principles [of property law are] irrelevant until normal abandonment proceedings before the STB have concluded." (quoting *Alexander* Def.'s Resp. at 18)); *Alexander* Tr. Oral Arg. at 13:13-20 (responding to a question from the Court about whether to apply state law or federal common law to analyze the "but-for world," Plaintiffs explained that "you would look at what would the owners have had under state law had it not been for the federal action of the Surface Transportation Board"). Defendant argues in both cases that Indiana law is irrelevant until the railroad owner actually abandons the disputed corridor. *Blevins* Def.'s Resp. at 23-24; *Blevins* Def.'s Supp. Brief (ECF No. 47) at 5; *Alexander* Def.'s Resp. at 18. While previous Court of Federal Claims decisions support both approaches, this Court agrees with the Defendant that the proper approach is to apply federal law.

Judges of the Court of Federal Claims have offered varying interpretations of the Federal Circuit's holding that a taking occurs "when an NITU is issued and state law reversionary interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled." *Caldwell v. United States*, 391 F.3d 1226, 1236 (Fed. Cir. 2004). Focusing heavily on the portion of that statement discussing "state law reversionary interests," the Court of Federal Claims concluded on remand of *Hardy I* from the Federal Circuit, that it should analyze the railroad's intent to abandon the disputed railroad under Georgia law. *Hardy v. United States*, 153 Fed. Cl. 287, 293 (2021) (*Hardy II*) (citations omitted). Similarly, in *Loveridge*, the court latched onto the Federal Circuit's statement in *Castillo v. United States*, 952 F.3d 1311, 1319 (Fed. Cir. 2020), that it "analyze[s] the property rights of the parties in a rails-to-trails case under the relevant state's law" to conclude that it should apply state law to the issue of whether abandonment would have occurred absent a NITU. *Loveridge*, 149 Fed. Cl. at 70-72. In contrast, *Memmer* applied *Caquelin*'s causation mandate without defaulting to a state law framework. 150 Fed. Cl. at 748. In that case, the court applied Indiana's abandonment statute only after it had concluded that the evidence suggested the railroad would have abandoned its line in the absence of a NITU, and only to show that the record established abandonment in-fact.

This Court finds it inappropriate to analyze causation under state abandonment laws because such an approach deviates from Federal Circuit precedent in three key respects. First, the analytical tracks laid by *Caquelin* do not journey through state law. The Federal Circuit held in *Caquelin* that there was no clear error by the Court of Federal Claims in finding that a railroad would not have abandoned the line at issue before the NITU's expiration date where the government failed to "point to any evidence at all affirmatively indicating that the railroad would have delayed abandonment" beyond the NITU's expiration. *Caquelin*, 959 F.3d at 1372-73. It

illustrated the government's failure by cataloging the evidence in the record supporting the conclusion that the railroad would have abandoned its line absent the NITU:

> The railroad filed an application to abandon, indicating an affirmative intent to abandon. When it was asked for consent to an extension of the December 30 expiration date, it refused, confirming an interest in abandoning sooner rather than later (in the absence of a promising negotiation for a trail agreement). It completed the abandonment just three months after December 31, 2013, the date on which it became legally authorized to abandon the line, suggesting a comparable time period had authority been granted as of July 5, 2013.

*Id.* at 1373. Notably, this discussion is unmoored to the relevant state law for abandonment. *Id.* The Federal Circuit mentions state law only at the very end of this discussion, and only to note that in addition to all the evidence supporting the view that the railroad would have promptly abandoned its line if a NITU did not issue — filing an application to abandon and refusing to extend the NITU expiration date — that the railroad's actions also met one of the preconditions for abandonment under Iowa law. *Id.* State abandonment law, however, did not dictate the analysis. *Id.*

Second, cases applying state abandonment law ignore the context of the Federal Circuit's maxim that it "analyze[s] the property rights of the parties in a rails-to-trails case under the relevant state's law." *Castillo*, 952 F.3d at 1319-20. That rule applies to the threshold issue of who owned the disputed land when the railroad easement was established and what interest those parties may have in the event the railroad abandons its easement. *See, e.g.*, *id.* (applying state law to interpret plat reservations to determine ownership of parcels in the railroad corridor); *Rogers v. United States*, 814 F.3d 1299 (Fed. Cir. 2015) (applying state law to evaluate the nature of easements conveyed to a railroad). The Federal Circuit has not applied that maxim to determine whether a railroad would have abandoned a line in the absence of a NITU. For this Court to do so here would run counter the Federal Circuit's admonition in *Caquelin* "that prior decisions do not establish

controlling precedent on an issue 'never squarely addressed.'" 959 F.3d at 1372 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)).

Finally, cases applying state abandonment law cannot be squared with the STB's preemption of state law. The Interstate Commerce Act has preempted state law on abandonment for over a century. *Chi. and N.W. Transp. Co. v. Kalo Brick & Title, Co.*, 450 U.S. 311, 318 (1981). The STB retains jurisdiction over the rail corridor, the railroad's common carrier obligation continues, and state law is preempted until the railroad obtains authority to abandon its rail lines and exercises that authority, as evidenced by the filing of a notice of consummation. *See Baros v. Tex. Mexican Ry. Co.*, 400 F.3d 228, 236 (5th Cir. 2005) ("[T]he decision actually to abandon a line rests with the carrier; it is only upon actual consummation of the abandonment that the STB's jurisdiction ceases."). Thus, the railroad must consummate abandonment under federal law and procedures, rather than state law and procedures, even in the absence of a NITU. Previous Court of Federal Claims decisions applying state law to analyze whether abandonment would have occurred in a hypothetical, NITU-free universe do not explain why federal standards that operate in the real world should not be applied in the counter-factual world. True fidelity to the Federal Circuit's holding in *Caquelin* compels the application of federal law to decide causation issues, not state abandonment law.

      b. <u>Initiating the Regulatory Process for Abandonment Raises a Presumption That Abandonment Would Have Occurred Absent a NITU, but the Government May Rebut that Presumption</u>.

Having resolved that the Court must apply federal law to determine whether CSXT would have abandoned the disputed corridor in the absence of a NITU, the Court shifts to analyzing which party bears the burden of establishing causation and the weight of such burden. As noted, the Federal Circuit did not explicitly define the burdens that each party bears in establishing "what the railroad would have done if there had been no NITU." *Caquelin*, 959 F.3d at 1372. The reasoning

of *Caquelin* and its progeny, however, suggests that a railroad's initiation of the abandonment process raises a presumption that the railroad would have abandoned its rail line in the absence of a NITU.  *See id.* at 1372-73; *Memmer*, 150 Fed. Cl. at 748; *Hardy II*, 153 Fed. Cl. at 293-96.  It is the Defendant's burden to identify evidence of a contrary intent.

In *Caquelin*, the government argued that there was "insufficient evidence to support a finding that the railroad would not have abandoned the line at issue [within the dates the NITU was active], even if no NITU had issued."  *Id.* at 1372-73.  The Federal Circuit flatly rejected that argument, explaining that "[t]he government does not point to any evidence at all affirmatively indicating that the railroad would have delayed abandonment past [the NITU's expiration date], had there been no NITU to interfere with the grant of authority of abandonment that was set to take effect on July 5, 2013."  *Id.* at 1373.  It explained that the railroad's application to abandon "indicat[ed] an affirmative intent to abandon."  *Id.*  It then detailed how the railroad's conduct after issuance of the NITU and after abandonment confirmed that initial intent.  *Id.*  In sum, the Court must assume that a railroad initiating and pursuing abandonment indeed intended to abandon the rail line absent a NITU unless there is evidence of a contrary intent.

The Court of Federal Claims' decision in *Memmer* illustrates that such a presumption is equally applicable when the railroad initiates the abandonment process by seeking an exemption. The railroad owner in *Memmer* filed a notice of exemption in which it averred "that it had satisfied all of the requirements to be exempt from abandonment proceedings."  150 Fed. Cl. at 748.  The court found that this declaration — considered along with the facts that (i) the railroad had executed a contract for the removal of rails and other materials from its line while the NITU was in effect and (ii) a railroad representative testified that even if the NITU expired that it was the railroad's intent to finalize abandonment or execute a trail-use agreement — established that the railroad

owner "had every intent to abandon the railroad lines during the period of time that the NITU was in effect, and was prevented from doing so by the existence of the NITU." *Id.*

This presumption, that a railroad owner that begins the abandonment process intends to abandon its rail line, can be overcome by evidence that the abandonment process was initiated by mistake or by conduct showing that the railroad never intended to abandon the line. *See Hardy II*, 153 Fed. Cl. at 294 (addressing "the apparently rare situation in which the Notice of Exemption and NITU, documents that would suggest an intent to abandon in most cases, are actively contradicted by other evidence"). On remand from the Federal Circuit, the court in *Hardy II* identified three factors relevant to whether the railroad would have abandoned the line in question in the absence of a NITU. *Id.* at 293-96. [12]

First, the court examined the railroad's various STB filings. *Id.* at 294-95. The evidence demonstrated that the railroad incorrectly described the end point of the line it sought to abandon in the railroad's Notice of Exemption and other STB filings. *Id.* at 294. The railroad corrected its erroneous description after it was notified of the error, with the corrected description excluding some parcels that were adjacent to the line as originally described. *Id.* Although not dispositive, the court found that the error suggested the railroad did not intend to abandon the parcels that were excluded from the corrected description. *Id.* at 295.

---

[12] While *Hardy II* examined abandonment under Georgia law, the analysis is substantively identical to *Caquelin*'s federal standard because railroad abandonment is determined in Georgia based on the railroad's intent. *See Hardy II*, 153 Fed. Cl. at 293 (collecting cases on Georgia railroad abandonment law). Given Georgia law requires the most exacting expression of intent — "clear, unequivocal, and decisive evidence of an intent to abandon the easement," *Whipple v. Hatcher*, 658 S.E.2d 585, 586 (Ga. 2008) — evidence to satisfy the Georgia standard would necessarily satisfy any intent-based inquiry under federal law.

Second, the court examined the railroad's explanation of its intent. *Id.* A railroad executive testified in a deposition, and again in a declaration executed over three years later, that the railroad "did not intend at any point to abandon the [disputed portion of the line]." *Id.*

Finally, the court examined the railroad's actions with the disputed portion of its line. *Id.* at 296. Around the time of alleged abandonment, the railroad had sought a new, decade-long operator lease that would continue long past the date of the NITU's issuance. *Id.* at 296. The operator with which the railroad was negotiating also invested considerable funds to maintain the line and acquire new customers for the line. *Id.* Rather than support an intent to abandon, "the time, effort, and financial resources invested in the track at issue demonstrate[d] [the railroad's] dominion and control over that portion of the line." *Id.*

The court did not find a single factor conclusive. *Id.* Instead, it concluded that the cumulative evidence of the railroad's STB filings, statements of intent, and actions with the line in question significantly undermined the intent to abandon expressed in the railroad's Notice of Exemption. *Id.* While *Hardy II*'s analysis does not bind this Court, this Court finds these factors helpful in determining whether Defendant rebutted the presumption of abandonment upon issuance of the NITU.

## III.   There Is No Dispute of Material Fact that CSXT Would Have Abandoned the Disputed Corridor in the Absence of a NITU.

The Railroad's actions in this case do not present the "apparently rare situation" described in *Hardy II* "in which the Notice of Exemption and NITU, documents that would suggest an intent to abandon in most cases, are actively contradicted by other evidence." *Hardy II*, 153 Fed. Cl. at 293. Plaintiffs contend that CSXT's conduct leading up to the NITU's issuance — discontinuance of rail use and initiation of the abandonment process — demonstrates an unequivocal intent by CSXT to abandon the disputed corridor absent issuance of the NITU. *See Blevins* Pls.' Mot. at 23-

24; *Alexander* Pls.' Mot. at 26-27.  Relying exclusively on a "Draft Declaration" submitted by a
CSXT employee, Gene Payne,[13] Defendant argues that the NITU cannot constitute a taking
because CSXT had not yet made up its mind about whether to consummate abandonment when it
filed its exemption notice.  *Blevins* Def.'s Resp. at 24-25; *Alexander* Def.'s Resp. at 19-20.

A closer inspection of Mr. Payne's Draft Declaration derails Defendant's argument.  The
declaration lacks any evidence creating a factual dispute as to CSXT's intent leading up to the
original date proposed for abandonment.  Instead, CSXT's STB filings, its employees' statements,
its discontinuance of service on the line since 2010, and its conduct with the disputed corridor,
including its formal opposition to any future rail traffic on the line, lead to one conclusion: CSXT
would have abandoned the disputed corridor absent issuance of the NITU.

    a.  <u>CSXT's Public Filings</u>

CSXT's filings with the STB demonstrate a clear intent to abandon the disputed corridor.
CSXT explained in its Combined Environmental and Historic Report that the disputed corridor
was only "used to store cars" in the years following discontinuance of service in 2010.  Combined
Environmental and Historic Report, STB Docket No. AB-55 (Sub-No. 775X) (*Blevins* ECF No.
27-3) (CEHR) at 3.  The Report further explained that CSXT did not expect "new rail oriented
business" to develop and that "the Line is no longer required for operating purposes."  *Id.*  CSXT
stated in unequivocal terms that it "will consummate the abandonment and abandon the Line."  *Id.*

---

[13] Although the document is entitled "Draft Declaration of Gene Payne" the declaration appears to
be executed in full.  *See* Payne Decl.  The *Alexander* Plaintiffs moved to strike Defendant's Payne
declaration as lacking foundation, personal knowledge, and veracity.  *See Alexander* Pls.' Reply
Regarding the Government's Submission of Gene Payne's Declaration (ECF No. 56) (moving to
strike Mr. Payne's declaration before Plaintiff withdrew its initial motion for summary judgment);
*Alexander* Pls.' Mot. at 28 n.24 (renewing the *Alexander* Plaintiffs' motion to strike filed during
briefing of the withdrawn motion for summary judgment).  However, since the Court is granting
Plaintiffs' partial summary judgment motions and the substance of Mr. Payne's Draft Declaration
does not alter outcome of the motions, the *Alexander* Plaintiffs' motion to strike is denied as moot.

CSXT confirmed this intent in its Verified Notice of Exemption, where it stated that it sought "to use the class exemption at 49 C.F.R. § 1152.50 to abandon [the disputed corridor]."  Verified Notice of Exemption filed by CSX, STB Docket No. AB-55 (Sub. No. 775X) (*Blevins* ECF No. 27-4) at 5.  CSXT's Verified Notice of Exemption was also accompanied by a sworn statement by Michael Navarro, a manager of cost and control at CSXT, that the facts in the Notice were true. *Id.* at 9.

Notwithstanding such clear statements of an intent to abandon, Defendant suggests that CSXT only "filed the exemption notice to explore selling the Hoosier Line to third parties," but does not cite any portion of CSXT's STB filings that would indicate as much. *See Blevins* Def.'s Resp. at 24; *Alexander* Def.'s Resp. at 19.  Defendant reaches this conclusion based exclusively on CSXT employee Gene Payne's statement that "CSXT had not made a final decision whether to consummate abandonment." *Blevins* Def.'s Resp. at 24 (citing Payne Decl. ¶ 9); *Alexander* Def.'s Resp. at 19 (same).  Even accepting the statement in Mr. Payne's Draft Declaration as true, it does not directly contradict the statements of intent in CSXT's public filings.  It is possible to both intend to abandon the line yet remain open to the possibility of selling it to an investor at the last moment.  Mr. Payne's statement merely encapsulates this flexibility that all railroads have up until they file a Notice of Consummation with the STB.  Payne Decl. ¶ 9.

Unlike in *Hardy II,* where evidence demonstrated that the railroad had misdescribed the line subject to abandonment, the statements in Mr. Payne's declaration do not contradict the contents of CSXT's STB filings.  While not dispositive, the Railroad's unequivocal statements about abandonment strongly suggest that CSXT would have abandoned the disputed corridor if the NITU had not interrupted the process.

   b.  Gene Payne's Testimony

During his deposition, Defendant's declarant, Gene Payne, echoed the intent to abandon expressed by CSXT in its STB filings.  Defendant's counsel asked Mr. Payne during his deposition whether CSXT "ever develop[ed] the intent to abandon the line" after starting "the process of abandonment."  Transcript of Videoconference Deposition of Gene Payne (*Alexander* ECF No. 64-3) (Dep. Tr.) at 78:13-24.  Mr. Payne responded in the affirmative: "That was our initial intent was to abandon the line, yes, sir."  *Id.* at 78:25-79:1.  Defendant's counsel tried to get Mr. Payne to state that CSXT currently does not wish to abandon the line, but Mr. Payne was unwilling to do so.  *Id.* at 79:2-9.  Instead, Mr. Payne explained that CSXT is in discussion with two parties for potential trail use of the disputed corridor and that "if we can reach an agreement for trails use, I think that benefits all parties."  *Id.* at 79:4-9.  However, Defendant cannot use the negotiations for a trail use agreement to negate Mr. Payne's statement that CSXT started the abandonment process to abandon the disputed corridor.   The causation analysis endorsed by the Federal Circuit focuses on a hypothetical world where the NITU did not issue; here, CSXT's discussions for a trail use agreement only occurred because of the NITU.   Mr. Payne's Draft Declaration and deposition testimony starkly contrast with the executive's testimony in *Hardy II* that the railroad "did not intend at *any* point to abandon."  *Hardy II*, 153 Fed. Cl. at 295 (emphasis added).  CSXT intended to abandon the disputed corridor absent issuance of the NITU.  Defendant cannot point to anything to the contrary.

Defendant nevertheless argues that that Mr.  Payne's Draft Declaration provides evidence that "CSXT would not have abandoned the line in the absence of the NITU."  *Blevins* Def.'s Resp. at 20; *Alexander* Def.'s Resp. at 14.  Specifically, Defendant points to paragraph 19 of Mr. Payne's declaration, which states that "[a]s trail use negotiations are still ongoing, CSXT has not made a

final decision on whether it will consummate abandonment." Payne Decl. ¶ 19; *Blevins* Def.'s Resp. at 20 (citing Payne Decl. ¶ 19); *Alexander* Def.'s Resp. at 14 (same). This Court disagrees that Mr. Payne's statement reveals anything about CSXT's intent to abandon in the "but for" world in which no NITU had issued. As an initial matter, the Draft Declaration contains legal conclusions, and even when "viewed in the light most favorable to the nonmoving party," its statements of fact do not address CSXT's intentions during the relevant timeframe — the period leading up to the originally planned date of abandonment. *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994)

This Court must disregard a portion of Mr. Payne's Draft Declaration that contains legal conclusions. "The court will not consider a declaration purporting to support a motion for summary judgment if the declaration contains statements that are legal conclusions, not based on the declarant's personal knowledge, or would otherwise be inadmissible as evidence." *Beres v. United States*, 143 Fed. Cl. 27, 66 (2019)); *see Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1174 (Fed. Cir. 2017) ("A 'conclusion[] of law' in a declaration 'cannot be utilized [i]n a summary-judgment motion.'" (quoting 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (4th ed. 2016))). Mr. Payne states that "issuance of the NITU did not cause CSXT to delay or defer consummation of abandonment of the Hoosier Line." Draft Declaration of Gene Payne (*Blevins* ECF No. 31-2; *Alexander* ECF No. 64-2) (Payne Decl.) ¶ 19. This is simply another way to say that Mr. Payne believes no government taking occurred; however, "[w]hether a taking has occurred is a question of law." *Caquelin*, 959 F.3d at 1366; *see Memmer*, 150 Fed. Cl. at 716 (explaining that "a taking occurs when 'government action destroys state-defined property rights,' . . . by compelling the continuation of a railroad-purposes easement to accommodate negotiations for a trail-use agreement" (quoting *Ladd I*, 630 F.3d at 1019)).

Accordingly, Defendant cannot rely on Mr. Payne's legal conclusion to contradict evidence showing CSXT's intent to abandon the disputed corridor.

The factual statements included in the Draft Declaration do not pull Defendant any closer to its goal of creating a factual dispute on causation. Most of the statements in Mr. Payne's Draft Declaration are irrelevant to causation because evidence of CSXT's current intent is not probative of what CSXT would have done several years ago in a hypothetical world in which a NITU did not issue and CSXT was not negotiating with potential trail developers. The Federal Circuit in *Caquelin* focused on whether there was any evidence that the railroad would have delayed abandonment "had there been no NITU to interfere with the grant of authority of abandonment that was set to take effect on July 5, 2013." 959 F.3d at 1373. Here, abandonment was initially planned to take effect on February 7, 2018. *See* Decision Recognizing CSXT's Petition (*Alexander* ECF No. 62-4) (*Blevins* ECF No. 27-7) at 3-4. Thus, to negate the presumption raised by CSXT's filings with the STB, Defendant must point to some evidence indicating a contrary intent on or before February 7, 2018.

Instead, Defendant cites to statements in Mr. Payne's Draft Declaration describing CSXT's current intentions for the disputed corridor and its current actions on the disputed corridor.

Defendant cites to paragraphs 17-19 of Payne's Draft Declaration and page 82 of Mr. Payne's deposition to support its argument that "CSXT would not have abandoned the line in the absence of the NITU." *Blevins* Def.'s Resp. at 20; *Alexander* Def.'s Resp. at 14, 19-20. Those citations indicate that CSXT continues to negotiate with potential trail operators under the NITU, Payne Decl. ¶ 17; "has not determined whether the trail use negotiations will be successful," *id.*; and "has not made a final decision on whether it will consummate abandonment." *Id.* ¶ 19. Each statement, which stems from issuance of a NITU, does not explain what CSXT would have done

in a hypothetical world in which a NITU never issued in early 2018, as *Caquelin* requires this Court to consider.

Mr. Payne's statements about CSXT's actions regarding the disputed corridor also lack relevance to the question of what CSXT would have done if a NITU had never issued. That CSXT has not yet completed tasks required under the National Historic Preservation Act to abandon a railroad does not impact the causation analysis because Defendant has not shown that CSXT would have also delayed this process in the hypothetical world where a NITU never issued. *See Blevins* Def.'s Resp. at 16 (citing Payne Decl. ¶¶ 12-13, 20). Nor does the number of extensions to the NITU negotiation period swing in Defendant's favor. *See Blevins* Def.'s Resp. at 17 (citing Payne Decl., ¶¶ 15-19); *Alexander* Def.'s Resp. at 19-20 (citing Payne Decl., ¶¶ 17-19). Simply because CSXT now finds it prudent to work toward a trail use agreement does not mean that it would not have consummated abandonment on February 7, 2018, if a NITU had not issued to facilitate the trail use negotiation. Rather than speak to causation, extensions of the NITU relate to the amount of just compensation that may be due to Plaintiffs, an issue not presently before the Court. *See Memmer v. United States*, 153 Fed. Cl. 707, 717 (2021) ("In most cases, landowners are awarded just compensation, either by the court or through settlement, after the NITU has expired and it is known whether the taking is permanent (due to the execution of a trail-use agreement) or temporary.").

While Mr. Payne's Draft Declaration offers some testimony from the relevant time frame, it sidetracks the ultimate issue of what CSXT would have done absent a NITU. Payne's Draft Declaration states that "[a]s of December 19, 2017 — the date on which CSXT filed the Notice of Exemption with the STB — CSXT had not made a final decision whether to consummate abandonment if STB authorization were received. Rather, CSXT filed the Notice of Exemption

to allow it explore negotiations with third parties to sell the Hoosier Line for continued rail service." Payne Decl. at ¶ 9. However, that CSXT's decision to abandon was not "final" does not "affirmatively indicat[e] that the railroad would have delayed abandonment" past February 7, 2018, if a NITU had not issued. *Caquelin*, 959 F.3d at 1373. It merely reflects that CSXT could have decided not to abandon the disputed corridor up until the time it filed a notice of consummation — something which every railroad may do — but not that CSXT would have done so in this situation. *See* 49 C.F.R. § 1152.29(e)(2) (requiring a railroad seeking abandonment to file a notice of consummation to complete abandonment of its line). Defendant cannot defeat a motion for summary judgment simply by pointing to a procedural possibility present in every Trails Act case.

Taken together, and "viewed in the light most favorable to [Defendant]," *Dairyland Power*, 16 F.3d at 1202, Gene Payne's testimony suggests that CSXT would have abandoned the disputed corridor if a NITU had not issued. Mr. Payne has at best only offered neutral evidence. He claims that CSXT has not made a "final decision" on abandonment but acknowledges that CSXT started the abandonment process with every intention to abandon the disputed corridor. Dep. Tr. at 78:25-79:1. Considering the facts before this Court, no rational trier of fact could consider Mr. Payne's explicit statement that CSXT's "initial intent was to abandon the line" and reach a conclusion other than that CSXT would have abandoned the disputed corridor if the NITU had not forestalled the abandonment process. Dep. Tr. at 78:25-79:1.

        c.  <u>CSXT's Conduct with the Disputed Corridor</u>

Finally, CSXT's conduct surrounding use of the disputed corridor also suggests that CSXT would have abandoned the disputed corridor absent issuance of a NITU. CSXT stated in its request to discontinue service through the disputed corridor that "it [was] seeking discontinuance authority here to avoid the costs of maintaining and operating the Line in the face of substantially diminished

traffic.  CSXT projects only 3 carloads of traffic on the Line in 2010."  Discontinuance of Service Exemption, STB Docket No. AB-55 (Sub-No. 698X) (*Blevins* ECF No. 27-1) at 3.  Defendant correctly notes that CSXT also stated in its request to discontinue service "that it would not remove track and material from the line and that it would 'preserv[e] the ability of CSXT to reinstitute service over the Line if future business will support the operation.'"  *Blevins* Def. Resp. at 13-14 (quoting *Blevins* ECF No. 31-1) at 5.  However, CSXT's subsequent conduct indicates that hope for such business quickly evaporated.

Unlike in *Hardy II*, where the railroad invested "time, effort, and financial resources" to obtain a new decade-long operator lease that would continue long past the date of the NITU's issuance, *Hardy II*, 153 Fed. Cl. at 294-96, here CSXT discontinued service over the disputed corridor in 2010 and has not pursued reactivating operations over the line.  *See also supra* Section III.a.  Indeed, in 2018 it even strongly opposed continuing operations over the disputed corridor when a shipper opposed CSXT's petition to abandon the line.  *See* CSX motion of Jan. 24, 2018, Docket No. AB-55 (Sub. No. 775X) (*Alexander* ECF No. 62-6) at 6 (stating that "after more than seven years of there being no rail service on the Line, the [potential shipper] failed to demonstrate that there is a continued need for rail service on the Line").  As with CSXT's STB filings and the statements of its employees, this factor alone is not dispositive.  However, it buttresses the consistent theme that CSXT would have abandoned the disputed corridor absent the NITU.

d.  No Rational Trier of Fact Could Find for Defendant on the Issue of Liability.

CSXT's STB filings, the statements of its employees, and its conduct in relation to the disputed corridor all strongly point to the conclusion that CSXT would have abandoned the disputed corridor the absent issuance of the NITU, in the hypothetical scenario the Court must examine under *Caquelin*.  Defendant "does not point to any evidence at all affirmatively indicating that the railroad would have delayed abandonment . . .  had there been no NITU to interfere."

33

*Caquelin*, 959 Fed. Cl. at 1373. Considering such evidence and applicable law, no reasonable fact finder could rule in Defendant's favor.

<u>CONCLUSION</u>

For the reasons set forth above, the *Alexander* Plaintiffs' Motion for Partial Summary Judgment (Case No. 18-cv-4371, ECF No. 62) and the *Blevins* Plaintiffs' Motion for Partial Summary Judgment (Case No. 18-4372, ECF No. 27) are **GRANTED**. The parties are directed to confer and **FILE** a Joint Status Report within 14 days, under their respective docket numbers, proposing a schedule for further proceedings to address the measure of just compensation owed to Plaintiffs.

IT IS SO ORDERED.

       <u>s/Eleni M. Roumel</u>
       ELENI M. ROUMEL
        Judge

February 18, 2022
Washington, D.C.

34